895 F.2d 1414
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
PEABODY COAL COMPANY, et al., Petitioners,
v.
DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED
STATES DEPARTMENT OF LABOR, and Anna Stroud, Respondents.
 No. 88-3970.
 United States Court of Appeals, Sixth Circuit.
 Feb. 15, 1990.
 
 Before KENNEDY and WELLFORD, Circuit Judges, and ANNA DIGGS TAYLOR,* District Judge.
 WELLFORD, Circuit Judge.
 
 
 1
 Respondent, Anna Stroud, is the widow of Owen Stroud, who died on July 29, 1977, at the age of sixty. Based on company records, the parties stipulated to 23 years of coal mine employment. All of Stroud's work was above ground as a welder and a repairman. During his employment by petitioner Peabody Coal Company (Peabody), Stroud worked full time.
 
 
 2
 In 1975, while still fully employed by Peabody, it was determined that Stroud suffered from incurable colon cancer. He was treated for the cancer, but it metastasized to his lungs, liver, and kidney. He continued to work sporadically during chemotherapy treatment but he was advised by his treating physician, Dr. Allen, to quit work because of the cancer, and accordingly Stroud stopped working in May of 1977.
 
 
 3
 Throughout his treatment of Stroud, Dr. Allen never diagnosed or treated any primary lung disease. In May 1978, Dr. Allen informed the Department of Labor that all of Stroud's problems were related to the cancer and its effects. None of the x-rays reviewed by Dr. Allen or other treating physicians revealed evidence of pneumoconiosis.
 
 
 4
 In July 1975, at the time of the cancer diagnosis, Dr. Allen observed that the miner's health had previously been good. A 30-year history of cigarette smoking was recorded. In a July 22, 1981 letter, Dr. Allen noted that Stroud "had no pulmonary complaints" prior to the diagnosis of cancer. Dr. Allen also noted primary cancer and stated, "the remainder of the patient's medical problems were directly concerned with his advancing tumor which resulted in his death on July 29, 1977."
 
 
 5
 The autopsy was performed by Dr. Frank Pitzer, who attributed the miner's death solely to the metastasized colon cancer, which he found to be unrelated to the miner's coal mine employment. He did, however, list "pulmonary anthracosis, bilateral, moderate," as a chronic disease suffered by the deceased miner. In a deposition, Dr. Pitzer explained that the miner suffered three components of lung disease apart from the cancer, including anthracosis, tuberculosis, and vascular arteriosclerotic disease.
 
 
 6
 Dr. Pitzer stated that three elements must be present to diagnose pneumoconiosis. First, anthracotic pigmentation must be present in the lungs; second, there must be a reaction of the tissue to the pigment; and third, the fibrosis must be associated with the pigment. Dr. Pitzer then reported that while the miner had pigmentation and fibrosis, the fibrosis was not wholly attributable to the pigmentation. Dr. Pitzer did acknowledge that some of the fibrosis "was due maybe to the anthracosis." In an attempt to clarify, he responded further: "It's anthracosis, but it's not the classic described anatomical description of coal workers' pneumoconiosis."
 
 
 7
 The attorney also asked Dr. Pitzer whether Stroud suffered from a lung disease at the time of his death. Dr. Pitzer responded that Stroud suffered from a significant disabling lung disease at the time of death:
 
 
 8
 [A]t the time of his death most of his lung disease that was producing the pulmonary trouble and resulted in his death was due to the cancer. The cancer had spread to his lungs. It had spreaded [sic] to both of his lungs. And at the terminal event, he had a hemorrhage and necrosis of the tumor in his left lung and that's what resulted in his death.
 
 
 9
 In addition, however, Dr. Pitzer also testified:
 
 
 10
 Well, this man--First of all, he had lung disease other than the cancer. Okay. The cancer was sort of the final straw. Now, the lung disease he had was due to a number of factors. Number one, this man has hardening of the arteries, arteriosclerotic vascular disease that was affecting his lungs some. That's one factor. Number two, he had had old tuberculosis[1] with reaction to the lung tissue to the TB with adhesions and some scarring. And, then, thirdly, he had this anthracotic pigmentation with some reaction to that. So he had a chronic pulmonary disease due to these three factors prior to getting cancer in the lung.
 
 
 11
 Dr. Pitzer, who it is to be remembered, only examined the deceased after his death, also indicated that "a very minimal compromise" was involved in the latter anthracosis element, and this would not, in his opinion, have caused "significant disability," and, finally, he added that this did not contribute "in any degree" to his death. In answer to a later question, Dr. Pitzer stated that "his pneumoconiosis component would not have contributed to any compromise," but he would have advised Stroud to "get out of the coal mines."
 
 
 12
 The slides prepared by Dr. Pitzer were reviewed by Dr. P. Raphael Caffrey, a pathologist, who stated:
 
 
 13
 There is scattered anthracotic pigment present in sections of lung tissues, but I do not see typical macules surrounded by focal emphysema, which is necessary to make a diagnosis of coal workers' pneumoconiosis. Therefore, on the sections I have reviewed, I cannot make that diagnosis.
 
 
 14
 (Emphasis added). In a supplemental report, Dr. Caffrey stated: "it is my opinion that Mr. Owen V. Stroud did not have coal workers' pneumoconiosis based on my review of the autopsy slides."
 
 
 15
 Dr. Richard P. O'Neill, a board-certified pulmonary disease specialist and professor of pulmonary medicine, reviewed the entire medical record. Dr. O'Neill listed the cause of death as "Carcinomatosis, generalized." In addition, he gave the basis of this diagnosis:
 
 
 16
 The microscopic description of the lung revealed, in addition to the metastatic tumor, the presence of anthracotic pigment with moderate interstitial fibrosis. There is no description of associated coal macules, focal emphysema or micro and/or macro nodules. Hence, the diagnosis is that of anthracosis and non-specific interstitial fibrosis of undetermined etiology and not coal worker's pneumoconiosis as defined by the American College of Pathology (1980).
 
 
 17
 Further he concluded that there was no causal relationship, direct or indirect, between inhalation of coal mine dust to Mr. Stroud's colon cancer. In addition, he was of the opinion that "Coal worker's pneumoconiosis, simple, if present, did not contribute to Mr. Stroud's death, directly or indirectly." Dr. O'Neill indicated that the microscopic pathological description of the lungs was insufficient to make a diagnosis of coal workers' pneumoconiosis. Finally, Dr. O'Neill concluded that Mr. Stroud's terminal respiratory disease and dysfunction was related to the cancer malignancy and not to the inhalation of coal mine dust. Thus, in Dr. O'Neill's opinion, Stroud would have been able to continue his regular employment had it not been for the development of cancer.
 
 
 18
 In a later deposition, Dr. O'Neill, a B-reader, reaffirmed his opinion that Stroud did not suffer from coal workers' pneumoconiosis and that the pneumoconiosis, if present, did not cause Stroud's death nor keep him from usual coal mine employment. This was based on his review of all the materials and information seen by Dr. Pitzer and all of the medical records.
 
 
 19
 Nothing in the pathological criteria in his view supported a finding of pneumoconiosis. Unlike Dr. Pitzer, Dr. O'Neill did not treat anthracosis as equivalent to pneumoconiosis, and stated the medical reasons for this view.
 
 
 20
 The ALJ considered the opinions of Drs. Pitzer, Caffrey, and O'Neill, and decided to weigh the conclusions of Dr. Pitzer more heavily, because Dr. Pitzer conducted the autopsy. Using the framework provided by 20 C.F.R. Part 727, the ALJ concluded that the interim presumption had been invoked under Sec. 727.203(a)(1) and (a)(4). With regard to invocation under subsection (a)(1), the ALJ stated that Dr. Pitzer's autopsy report established chronic pulmonary disease that included moderate bilateral pulmonary anthracosis. With regard to subsection (a)(4), the ALJ indicated that the interim presumption may be invoked when other medical evidence establishes a totally disabling respiratory or pulmonary impairment. The ALJ held that subsection (a)(4) requires only a showing of total disability resulting from a respiratory or pulmonary impairment, and the "etiology of the impairment is not a relevant consideration." Based on Dr. Pitzer's deposition, the ALJ found that the claimant "has established evidence of a totally disabling pulmonary and respiratory impairments sufficient to invoke the presumption of subsection (a)(4)."
 
 
 21
 The ALJ then considered rebuttal evidence under Sec. 727.203(b). Because the miner had died, rebuttal under subsections (b)(1) and (b)(2) was impossible. He conducted, however, a detailed analysis under section (b)(3), which provides for rebuttal of the interim presumption when the relevant "evidence establishes that the miner's total disability or death did not arise in whole or in part out of coal mine employment...." Based upon the autopsy report, and the opinions of Drs. Caffrey and O'Neill, the ALJ found that the employer established that the miner's death did not arise out of his coal mine employment. The ALJ noted that the employer "must also show that the miner's pulmonary disability from which he suffered at the time of his death did not arise in whole, or in part, from his coal mine employment." Because neither Dr. Pitzer nor Dr. O'Neill stated conclusively that any of the miner's disability was due to pneumoconiosis, and because Dr. Caffrey's report neither proved nor disproved such relationship, the ALJ concluded that the employer did not meet its burden under section (b)(3). Finally, the ALJ found that the presumption was not rebutted under subsection (b)(4). He, therefore, determined that Stroud was entitled to benefits.
 
 
 22
 Peabody then appealed the ALJ's order to the Benefits Review Board, which affirmed the decision of the ALJ. Petitioner now seeks review by this court. We reverse.
 
 
 23
 Peabody first contends that the interim presumption should not have been invoked because the miner did not establish that he suffered from pneumoconiosis. At issue in this respect is the invocation of the interim presumption under Sec. 727.203(a)(1) (based on autopsy evidence) and under subsection (a)(4) (miner suffered from a totally disabling respiratory or pulmonary disease). Peabody argues that the term "anthracosis," when properly understood, means a certain pigmentation of the lung, and is not a disease resulting from exposure to coal dust equivalent to pneumoconiosis. Peabody then contends that the references in the autopsy report and in Dr. Pitzer's deposition to "anthracosis" mean only "anthracotic pigmentation," and not a form of pneumoconiosis with resulting fibrosis.
 
 
 24
 "[T]he medical definition of pneumoconiosis, or 'coal workers' pneumoconiosis,' is far narrower than the definition of pneumoconiosis in the Black Lung Benefits Act." Pavesi v. Director, OWCP, 758 F.2d 956, 964 (3d Cir.1985) (emphasis in original). According to the Director, Peabody was required to demonstrate the absence not only of classic coal workers' pneumoconiosis, but also of "legal pneumoconiosis," within the meaning of the Act in order to rebut the interim presumption. We harbor serious reservations about this question in light of the evidence in this case, but it is not necessary for us to conclude that the ALJ's invocation of the interim presumption was incorrect to reach the result indicated.
 
 
 25
 "Pneumoconiosis" means a "chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment." 30 U.S.C. Sec. 902(b). 20 C.F.R. Sec. 727.202 defines pneumoconiosis as
 
 
 26
 a chronic dust disease of the lung and its sequelae including respiratory and pulmonary impairments, arising out of coal mine employment. This definition includes, but is not limited to, coal workers' pneumoconiosis, anthracosilicosis, anthracosisanthrosilicosis, massive fibrosis silicosis or silicotuberculosis arising out of coal mine employment. For purposes of this definition, a disease "arising out of coal mine employment" includes any chronic pulmonary disease resulting in respiratory or pulmonary impairment significantly related to, or aggravated by, dust exposure in coal mine employment.[2]
 
 
 27
 Anthracotic pigmentation alone, however, does not establish pneumoconiosis, see Sturms v. Badger Coal Co., 4 BLR 1-208, 1-210 (1981). It must be accompanied by fibrotic changes in the lung tissue to establish the existence of legal pneumoconiosis. Fetterman v. Director, OWCP, 7 BLR 1-688, 1-691 (1985); see also McClendon v. Drummond Oil Co., 861 F.2d 1512, 1514 (11th Cir.1988) (indicating that findings of nodules of anthracosis and fibrosis "clearly constitute substantial evidence" of pneumoconiosis). We have indicated only that anthracosis is related to pneumoconiosis. Lykins v. Director, OWCP, 819 F.2d 146, 148 (6th Cir.1987). See also Campbell v. Consolidation Coal Co., 811 F.2d 302 (6th Cir.1987).
 
 
 28
 In the instant case, the ALJ determined that the autopsy report, along with Dr. Pitzer's deposition testimony, established the existence of pneumoconiosis. The ALJ accepted Dr. Pitzer's somewhat equivocal opinion in the face of all other medical proof in this record, but the Benefits Review Board affirmed this result based on importance of the autopsy report. See Fetterman, 7 BLR at 1-691. We do not have to reach a different conclusion, despite our reservations, to reverse the decision.
 
 
 29
 Rebuttal under subsection (b)(3) occurs when "[t]he evidence establishes that the total disability or death of the miner did not arise in whole or in part out of coal mine employment...." 20 C.F.R. Sec. 727.203(b)(3). The ALJ concluded that the miner's death did not arise in whole or in part out of coal mine employment, and that portion of subsection (b)(3) is not at issue here. Peabody claims that the undisputed medical evidence establishes that the miner was not disabled in whole or in part by pneumoconiosis.
 
 
 30
 As we read the record in this case, contrary to the interpretation given by the ALJ (and the Board in affirming the result), both Dr. Pitzer and Dr. O'Neill concluded that the miner's disability was not due to, or caused by, coal dust exposure, nor to work in the mines. Dr. O'Neill's uncontradicted testimony was that simple pneumoconiosis, if it existed, does not necessarily bring about any pulmonary impairment, and did not in this case. Such impairment, if any, for example, may come about by reason of a persistent history of cigarette smoking, which, in his view was "more deleterious to an individual's lungs than inhalation of coal, rock, or sand dust." Dr. Caffrey and Dr. Allen supported Dr. O'Neill's view about the nature of Mr. Stroud's pulmonary problems. Dr. Pitzer's view was that some of the pigmentation he found in Mr. Stroud's lungs was "maybe" due to anthracosis, but certainly he agreed most of it was due to "another process," (perhaps arthrasclerotic disease or tuberculosis which may result in "some fibrous reaction"). Dr. Pitzer conceded also that this pigmentation was "similar" to that in the lungs of a "long time smoker." In addition, Dr. Pitzer also testified that clearly most of the lung disease was "due to the cancer." In sum, Dr. Pitzer conceded that the anthracosis would not have precluded Stroud from "continuing in his employment," would not have "been of sufficient magnitude to compromise him in any way," nor "caused him any problem."[3]
 
 
 31
 The doctors all agreed that the cause of death, the cancer, was not related to work in the coal mines nor to any anthracosis condition. At best in this case, Mr. Stroud was found to have minimal or mild anthracosis, which was not "in any way" compromising with respect to his ability to work as he had done for years despite tuberculosis, arteriosclerosis and heavy smoking.
 
 
 32
 We believe, then, as a matter of law on this record that Peabody has established rebuttal under 727.203(b)(3). See Wright v. Island Creek Coal Co., 824 F.2d 505 (6th Cir.1987); Moseley v. Peabody Coal Co., 769 F.2d 357 (1985); Ramey v. Kentland Elkhorn Coal Corp., 755 F.2d 485 (6th Cir.1985).
 
 
 33
 The evidence did not establish that disability or death of the miner was caused or contributed to by coal mine employment. The death or "disability did not arise in whole or in part out of coal mine employment." Gibas v. Saginaw Mining Co., 471 U.S. 1116 (1985).
 
 
 34
 Accordingly, finding that rebuttal has clearly been established by the record in this case, we REVERSE the award of benefits charged against petitioner Peabody.
 
 
 
 *
 THE HONORABLE ANNA DIGGS TAYLOR, United States District Court for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 Neither the arteriosclerosis nor the tuberculosis was in anyway related to Stroud's coal mine employment
 
 
 [2]
 Under the Part 718 final regulations, the definition of pneumoconiosis expressly lists "anthracosis" as a comparable coal mine-related lung disease. See 20 C.F.R. Sec. 718.201
 
 
 [3]
 Dr. Pitzer also diagnosed emphysema in both lungs which was "not associated with the anthracosis."